## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION


**IRMA HALL,**

      **Plaintiff,**

**vs.**                                                      **Case No. 1:10cv204-MP/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the

decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

Plaintiff, Irma Hall, applied for disability insurance benefits and supplemental

security income benefits.  Her last date of insured status for disability benefits is June

30, 2012.  Plaintiff alleges disability due to residual problems after right knee surgery,

pain in her back, neck, and arm, numbness on the right side of her body, and

hypertension, with onset on December 12, 2006.  Plaintiff was 52 years of age on

December 7, 2009, the date of the administrative hearing, has a 12th grade education

and some college, and has past relevant work as an early childhood teacher, data entry

clerk, and sales clerk.  The Administrative Law Judge found that Plaintiff had the

residual functional capacity to do a limited range of light work, can still do her past

relevant work, and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

The administrative hearing was held on December 7, 2009.  R. 338.  Plaintiff was

52 years of age.  R. 341.  Plaintiff was five feet seven inches and weighed 230 pounds.

R. 349.

Plaintiff said that she did not do yard work, and her daughter helps her with

house work.  R. 346.  Plaintiff said that a rail had been put up in her bedroom for

support, but since 2006 she had used a cane to ambulate.  R. 346.  She said she did

her laundry, but she could not bend to put clothing into the dryer.  Id.  Instead, she

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx, or PUBMED HEALTH, found at http://www.ncbi.nlm.nih.gov/pubmedhealth/, or EVERYDAYHEALTH, found at http://www.everydayhealth.com/drugs. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS (MERRIAM-WEBSTER), found at: www.nlm.nih.gov/medlineplus/mplusdictionary.htm or NATIONAL INSTITUTES OF HEALTH, found at: http://health.nih.gov.  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.   The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

places the wet clothing on the door of the dryer and uses her cane to push the clothing into the dryer.  R. 346-347.

Plaintiff said that she has difficulty bending due to pain in her lower back.  R. 347. She said that was "really rough for me," and she said that after sitting 30 minutes, her right shoulder pulls forward.  R. 352.  She said that this causes a muscle spasm in her lower back going down into her little toe.  *Id.*  She must keep her leg elevated and stretched when she sits.  R. 353.

She said she thought she could stand for an hour or less.  R. 352.  She said that when she walks 15 or 30 minutes, her right knee begins to swell.  *Id.*  Plaintiff said that she could not work 8 hours a day in a job that allowed her to sit or stand.  R. 353.

Plaintiff said that she had a "big knot" in her right shoulder.  R. 348.  She said that she had numbness, had difficulty picking things up, and her shoulder was weak.  *Id.* She thought that she could lift two to five pounds.  *Id.*

She said she was able to shop for groceries, but did so only about twice a month. R. 349.  Her groceries were put into small bags.  *Id.*

Plaintiff testified that four months earlier, she had tried to work at a day care center as a volunteer, but her shoulder and back started "killing" her and she had to quit after working 3 hours.  R. 353.  She then tried a stock clerk and cashier job at "Kangaroo," a convenience store, and had to give up that work after only 2 hours.  *Id.*

Plaintiff said she took a muscle relaxer, a pain medication, had cortisone shots, used an electric stimulator, and used a thermal wrap for her pain.  R. 347-348.  She

said that the medication made her sleepy.  R. 355.  She also said it caused tinnitus.  R. 356.

**Medical evidence**

In December, 2006, Plaintiff was hit by a fork lift as she was working.  R. 125. She fell from a ramp and landed on her right knee, and the crates from the fork lift fell onto her back.  R. 126.  Plaintiff initially complained of numbness of the right lower extremity, severe right knee pain, and right rib and back pain, with some weakness in the lower right extremity.  *Id*.  Plaintiff said that her right leg from foot to groin felt numb. *Id*.  On examination Plaintiff's physician, Joshua Kouri, M.D., found that Plaintiff was inconsistent at times, saying she could feel the pinprick and, at other times, could not. R. 127.  Straight leg raising was positive for pain on the right.  R. 128.  An x-ray of her spine revealed no evidence of fracture.  *Id*.  An MRI of her spine was essentially normal. *Id*.  It was determined that there was no need for neurosurgical intervention.  R. 129. Dr. Kouri said that he could not explain Plaintiff's symptoms and weakness as they did not seem to follow an appropriate pattern for peripheral nerve or spinal cord injury.  *Id*.

There is another medical note dated February 13, 2007, finding that another MRI, conducted on January 30, 2007, revealed no disc protrusions or herniations, though Plaintiff had an incidental hemangioma of the L5 body.  R. 125.  The reviewing physicians said that no surgical lesion appeared on the MRI scan that "could be responsible for her symptomatology in the lumbar spine."  *Id*.  It was noted that she was doing well, except for right lower extremity pain.  *Id*.

On March 13, 2007, Plaintiff was examined for a workers' compensation second opinion by James W. Berk, M.D., of The Orthopaedic Institute.  R. 199.  Dr. Berk said he was "not clear as to why she continues to have right-sided pain" from her accident with the forklift.  *Id.*  He wrote:

> Her EMG/nerve conduction studies that were done on 1/29/07 were completely normal, showing no significant neuropathy or radiculopathy of the right lower extremity.
>
> She had thoracic spine and lumbar spine MRI scans that showed no significant findings.  She has some mild multilevel degenerative facet disease, but there is no significant neural foraminal encroachment or nerve root compression noted.
>
> She had an MRI of the sacrum that was normal except for left ovarian cyst.

R. 199.  Dr. Berk said that Plaintiff complained of pain throughout her right hip, right knee, and right leg.  *Id.*  She said it was difficult for her to stand for prolonged periods of time, and she was unable to bend.  *Id.*  She denied any "frank weakness" in her lower extremities or swelling in her right knee, but felt as though she was not stable when walking.  *Id.*  She was morbidly obese.  *Id.*

Dr. Berk completed a functional limitations form for workers' compensation and expressed the opinion that Plaintiff's only limitations were lifting from the floor to the waist of less than 20 pounds and lifting from the waist to overhead of less then 10 pounds.  R. 179.  He stated no limits for sitting or standing.  *Id.*  His opinion was based solely upon Plaintiff's right knee pain, and he said that maximum medical improvement could not yet be determined.  R. 178, 179.

On examination, Dr. Berk noted that Plaintiff walked into the office with high

heels on and her gait was "non-antalgic."  R. 200.  He found that she had "fairly full

lumbar flexion, extension, sideward bending, lateral rotation, within normal limits."  *Id.*

She "had no significant thoracic or lumbar tenderness with direct palpation," had no

paraspinal spasm, and no sciatic notch tenderness.  *Id.*  The straight leg raising test

was negative for pain, and Plaintiff was able to heel and toe walk.  *Id.*  Plaintiff's right

knee had no significant effusion, but was tender with direct palpation over the medial

joint line.  *Id.*  Dr. Berk reviewed Plaintiff's "knee radiographs" and saw "no significant

degenerative signs, no signs of acute fracture, and no significant effusions."  *Id.*  His

assessment was "right lower extremity pain, unclear etiology, right knee pain, evaluate

for possible internal derangement, lumbago and myofascial pain, lumbar segment, and

normal MR scans."  *Id.*  He transferred Plaintiff to physiatry[2] for evaluation.  R. 201.  He

planned to further evaluate Plaintiff's right knee by MRI, but if that was negative, he felt

that he had nothing to offer Plaintiff from an orthopedic viewpoint.  *Id.*

Plaintiff returned to Dr. Berk on April 9, 2007, for knee pain.  R. 196.  He said that

the MRI of her knee showed changes consistent with "complex degenerative tear

extending to the anterior junction."  *Id.*  Plaintiff said that she was still having "fairly

moderate to severe pain in the right lateral aspect of the knee," and was not getting any

significant relief with pain medications.  *Id.*  She walked, however, with a non-antalgic

gait, had full range of motion in both knees, but her knee was tender with direct

---

[2] Physiatry is physical medicine and rehabilitation.  MEDLINE PLUS (MERRIAM-WEBSTER).

palpation.  *Id.*  Dr. Berk said that she was to follow up with Dr. Jaffe "for meniscal resection."  *Id.*

On April 11, 2007, Plaintiff was seen by Edward M. Jaffe, M.D.  R. 193-195.  In addition to her right knee pain, Plaintiff complained of pain along the lateral aspect of her right leg.  R. 193.  He noted that she walked with a mild limp on the right.  R. 194.  Alignment of her right knee was normal, and there was no right knee effusion.  *Id.*  Plaintiff had tenderness to palpation at the lateral joint line of her right knee.  *Id.*  X-rays revealed mild to moderate degenerative changes at the right knee, but articular cartilage height was satisfactorily maintained.  *Id.*.  There were "peripheral osteophytes in all three compartments."  *Id.*  Dr. Jaffe said that the March 19, 2007, MRI showed "evidence of a complex tear of the anterior horn of the lateral meniscus extending into the anterior junction region," with "some graying at the free margin of the body of the medial meniscus."  *Id.*  It also showed grade 3 chondromalacia[3] in all three compartments, and small to moderate joint effusion without popliteal cyst formation.  *Id.*  Dr. Jaffe's assessment was a "right knee lateral meniscal tear and mild to moderate underlying degenerative joint disease."  R. 195.  Plaintiff elected to proceed with right knee arthroscopic surgery.  *Id.*

The knee surgery was performed on April 20, 2007.  R. 189.  Surgery confirmed that Plaintiff had had a complex tear of the anterior horn and junction region of the lateral meniscus and fairly extensive chondromalacia in all three compartments.  R. 191.

---

[3] Chondromalacia is the abnormal softening of cartilage.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On April 26, 2007, six days after the surgery, Plaintiff was walking with a limp but without her crutches.  R. 186.  She was healing well but slowly and was told not to work at that time.  *Id.*

Plaintiff returned to Dr. Jaffe on June 4, 2007.  R. 185.  She had mild knee pain and weakness.  *Id.*

She was seen again by Dr. Jaffe on July 30, 2007, about three months after surgery.  R. 184.  She still had knee soreness and felt that her knee was weak.  *Id.*  She walked with a mild limp on the right, but the surgical sites were well-healed.  *Id.*  Dr. Jaffe noted that there was slow progress, limited by degenerative joint disease.  *Id.*  He ordered that she continue with physical therapy, refilled prescriptions for ibuprofen and Lortab,[4] and thought that Plaintiff might benefit from Synvisc[5] injections.  *Id.*

On August 27, 2007, Dr. Jaffe wrote a "to whom it may concern" letter requesting authorization for Synvisc injections.  R. 183.  He said that Plaintiff had been in physical therapy for four months without improvement, and that further therapy "will not likely lead to any improved status in this patient."  *Id.*

------------------------

[4] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.  Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[5] Synvisc, or Hylan G F 20, is similar to the fluid that surrounds the joints in your body.  This fluid acts as a lubricant and shock absorber for the joints.  Hylan G-F 20 is used to treat knee pain caused by osteoarthritis.  Hylan G-F 20 is usually given after other arthritis medications have been tried without successful treatment of symptoms.  EVERYDAYHEALTH.

On September 17, 2007, Dr. Jaffe again saw Plaintiff for her first Synvisc injection.  R. 182.  The second injection was on September 27, 2007, and her third was on October 8, 2007.  R. 181, 180.

On October 8th, Plaintiff said that Dr. Valentine was treating her back pain, which she thought was work-related, and she said she could not do any further physical therapy with her knee due to back pain.  R. 180.  She was interested in pursuing training for sedentary work.  *Id*.  On examination, Dr. Jaffe noted that Plaintiff still walked with a mild limp on the right, but without assistive devices.  *Id*.  Dr. Jaffe said that Plaintiff had reached maximum medical improvement with her right knee and he assigned an 8% whole body permanent impairment rating for the right knee expressly without any rating for her back problems.  *Id*.

Dr. Jaffe filled out four workers' compensation functional limitations forms during the period from April through September, 2007.  R. 167-177.  He checked the box that indicated that Plaintiff's "functional limitations and restrictions, identified below, are of such severity that he/she cannot perform activities, even at a sedentary level . . . ," but he did not indicate any work restrictions for Plaintiff on these forms.  R. 177, 175, 173, 172, 170, 168.  On the last visit, on October 8, 2007, Dr. Jaffe said that Plaintiff had reached maximum medical improvement, as noted above, and could return to work, but could not bend, carry, climb, kneel, or lift, and was limited in her ability to stand or walk.  R. 166.  He did not indicate a limitation for sitting.  *Id*.  Dr. Jaffe's focus on October 8, 2007, was upon Plaintiff's knee impairment.  R. 180.

Plaintiff was seen by Robert G. Valentine, Jr., M.D., on September 21, 2007.  R. 294-297.  Plaintiff said she had suffered aching lower back pain since the work accident on December 17, 2006.  R. 297.  She said she had numbness on the right side and loss of bladder control and considered herself disabled by the injury.  *Id*.  She said that the pain was increased by massage, sitting, standing, and walking, as well as bending.  *Id*.  He noted that she also had had surgery for a meniscal right knee tear.  R. 296.  Dr. Valentine noted that Plaintiff was overweight, weighing 201 pounds at 5 feet 7 inches tall.  R. 295-296.  He noted thoracic muscle tenderness, and lumbar tenderness and spasm.  R. 295.  Flexion and extension of Plaintiff's lumbar spine were limited.  *Id*. Plaintiff had full range of motion in her cervical spine.  *Id*.  Her gait was abnormal, antalgic.  *Id*.  The sitting straight leg raising test was negative for lumbar and radicular pain.  R. 294.  The supine straight leg raising test was positive for radicular pain in the right lower back.  *Id*.  The axial loading test was positive for lower back pain.  *Id*.  Dr. Valentine prescribed a TENS unit, but recommended a combo electrical stimulator.  *Id*. He ordered a "VaNCT" study of Plaintiff's spine.  *Id*.  He wanted to work on getting Plaintiff "off opiates."  *Id*.  Dr. Valentine also filled out a workers' compensation form.  R. 292-293.  He wrote "TTD" on the workers' compensation form, indicating that he thought that Plaintiff was temporarily totally disabled.  R. 292.

On September 28, 2007, Dr. Valentine performed a lumbar plexus electrodiagnostic nerve conduction study (the VaNCT he had ordered).  R. 290.  He found severe impairment (+4) of the right saphenous (L4), sural (S1), and post femoral cutaneous (S2) nerves.  *Id*.  He also found abnormalities on the left at L1, L3, L5, S1,

and S2.  *Id.*  He said that ratings in the +4 to +5 range "are most often associated with

central disc etiologies."  *Id.*  On October 1, 2007, Dr. Valentine conducted a cervical

plexus electrodiagnostic nerve conduction study.  R. 288.  He noted a marked (+3)

impairment of the right radial nerve lateral branch (C6).  *Id.*

On October 5, 2007, Dr. Valentine examined Plaintiff.  R. 284.  Her range of

motion in her lumbar spine was limited, and she had paraspinous tenderness with

muscle spasm.  *Id.*  Dr. Valentine reviewed the electrodiagnostic studies and said that a

radicular pain component was suggested at L4, S1, and S2 nerve roots.  R. 283.  A

TENS unit trial was ordered.  *Id.*  He continued to find Plaintiff to be temporarily totally

disabled.  R. 285.

On October 19, 2007, Plaintiff told Dr. Valentine that she experienced pain at

level 8 out of 10 in her low back, neck, and shoulders.  R. 282.  A TENS unit and

physical therapy twice weekly were ordered.  *Id.*  A methylprednisolone dose pack had

not helped.  R. 281.  Dr. Valentine strongly suggested that Plaintiff see another

physician to get her blood pressure under control.  *Id.*  He continued to find that she was

temporarily totally disabled.  R. 279.

On October 25, 2007, a state agency physician, Eric Puestow, M.D., who did not

examine Plaintiff, reviewed some of the medical records and determined that Plaintiff's

assertions of "ongoing pain and dysfunction are poorly supported by the date.  Note

evidence of symptom magnification."  R. 141.  He thought that Plaintiff was capable of

doing light work.  R. 137.  "Light work involves lifting no more than 20 pounds at a time

with frequent lifting or carrying of objects weighing up to 10 pounds. . . ."  20 C.F.R. §§

404.1567(b) and 416.967(b).  Dr. Puestow's findings indicated that he did not consider the records that might have then existed from Dr. Valentine.  R. 138.  For example, he did not mention Dr. Valentine's electrodiagnostic nerve conduction studies.

On November 19, 2007, Plaintiff returned to Dr. Valentine with complaints of pain in her right shoulder, lower back, and neck.  R. 270.  She was taking tramadol[6] and Norflex.[7]  *Id*.  Plaintiff had started physical therapy with an R. Johansen, but reported that she had received no benefit from the TENS unit.  *Id*.  Dr. Valentine recommended that she use an electrical stimulator instead.  *Id*.  Plaintiff reported a reduction of 50% of her pain with the electrical stimulator and an epidural injection.  *Id*.

On December 10, 2007, Plaintiff was seen by Dr. Valentine, reporting improved neck pain, but that she had pain in her lower back into her right hip.  R. 271-272.  Her gait was mildly antalgic.  R. 272.  Dr. Valentine's findings and recommendations were essentially the same as the last visit.  *Id*.  He continued to find Plaintiff to be temporarily totally disabled.  R. 273.  The form was also signed by Dr. Valentine's physician's assistant, Thomas Thompson.  *Id*.

On January 7, 2008, Plaintiff was seen again by Dr. Valentine.  R. 264-265.  She said she had sharp pain on the right side of her neck and arm, and she felt that the pain was increasing.  R. 265.  Her grip strength was decreased on the right side and her gait

---

[6] Tramadol hydrocholoride is marketed as Ultram, a centrally acting synthetic opioid analgesic.  PHYSICIANS' DESK REFERENCE (2005).

[7] Norflex is the brand name for Orphenadrine, which is used with rest, physical therapy, and other measures to relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  Orphenadrine is in a class of medications called skeletal muscle relaxants.  It works by changing the way the body senses muscle pain.  PUBMED HEALTH.

was antalgic.  *Id.*  Dr. Valentine ordered an MRI of Plaintiff's cervical spine.  R. 264.

Physical therapy was recommended.  *Id.*  He and PA Thompson found that Plaintiff

continued to be temporarily totally disabled.  R. 267.

On the cervical MRI was conducted on January 11, 2008.  R. 263.  A slight posterior

broad-based annular disc bulge was noted at C4-C5, with mild disc space narrowing,

but without prominent central canal stenosis or neuroforaminal narrowing.  *Id.*  No other

abnormalities were noted from C2 through T1.  It was concluded that Plaintiff had "no

disc protrusions, central canal stenosis or neuroforaminal narrowing throughout the

cervical spine."  R. 262.

Dr. Valentine again saw Plaintiff on January 28, 2008.  R. 261.  She reported

pain at level 8 on a scale of 10 on the right side of her neck and on the right side of her

lower back.  *Id.*  Dr. Valentine mentioned the MRI results, noting the minimal

degenerative changes.  R. 259.  Plaintiff's right shoulder had limited range of motion,

with complaints of pain, and her biceps were tender on the right.  *Id.*  She said she had

to sleep with her right arm above her head to reduce pain, and Dr. Valentine noted that

this was a classical sign of cervical herniated nucleus pulposus.[8]  *Id.*  She had another

injection for shoulder pain.  *Id.*

On February 13, 2008, another non-examining state agency physician, Donald

Morford, M.D., reviewed the records, but discussed only Plaintiff's knee impairment and

---

[8] A herniated nucleus pulposus (NHP) is a slipped disc along the spinal cord. The condition occurs when all or part of the soft center of a spinal disc is forced through a weakened part of the disc. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

treatment by Dr. Jaffe,[9] and determined that Plaintiff could do light work.  R. 145.  Dr. Morford, however, found that the severity of the symptoms and the alleged effect upon Plaintiff's functioning was credibly consistent with the medical evidence.  R. 149.

On February 14, 2008, Dr. Valentine responded to a request from Plaintiff's employer, asking for a description of her work limitations.  R. 160.  Plaintiff had told her employer that she wanted to work in a Dollar General warehouse in some capacity, and did not "want to fall into the medication only lifestyle."  *Id.*  Dr. Valentine said that Plaintiff could not reach with her right arm, could do occasional lifting of no more than 10 pounds, but with no lifting with her right arm.  *Id.*  He said she could stand occasionally, had to change positions frequently, could sit occasionally, and had a 4 hour per day limit for work.  *Id.*  He said she could not do any squatting, kneeling, climbing, or bending.  *Id.*  Dr. Valentine concluded: "I do not know whether she will actually tolerate this but do not object to her making an attempt."  *Id.*

On February 25, 2008, Dr. Valentine and PA Thompson determined that Plaintiff could work only 4 hours per day.  R. 254.  On that date, Plaintiff reported that her pain level was 8.  R. 253.  Dr. Valentine thought that there was no evidence of cervical herniated nucleus pulposus.  *Id.*  He recommended an orthopedic consultation to evaluate Plaintiff's right shoulder, a physical medicine consultation, physical therapy, trigger point injections, purchase of a combo electrical stimulator, and a trial of

---

[9] Dr. Valentine's records of treatment of Plaintiff's shoulder and back pain were not mentioned.  R. 145.

Oxaprozin.[10]  *Id.*  Dr. Valentine again mentioned the abnormal results from the nerve conduction studies.  *Id.*

On March 24, 2008, Dr. Valentine and PA Thompson felt that Plaintiff had the same limits as found on February 25, 2008, and could stand only 30 minutes at a time. R. 249.

On April 17, 2008, Dr. Valentine gave Plaintiff a lumbar epidural injection.  R. 245.  He and PA Thompson felt that Plaintiff had the same significant limitations as noted on March 24, 2008.  R. 243.

On May 6, 2008, Plaintiff told Dr. Valentine that the pain was worse because she had not been authorized to attend physical therapy for a month.  R. 242.  She reported an increase in night-time muscle spasm.  *Id.*  An orthopedic consultation to evaluate her right shoulder was recommended but not yet authorized.  R. 241.  A physical medicine consult was also recommended but not authorized.  *Id.*  Dr. Valentine said that trigger point injections in Plaintiff's "right upper trap" were of no benefit.  *Id.*  He continued to recommend physical therapy with R. Johansen, but noted that physical therapy was not authorized.  *Id.*  He said that the lumbar injection had helped, but Plaintiff's pain was again increasing.  *Id.*  He noted that a study of Plaintiff's cervical and lumbar plexus bilaterally suggested a radicular component to pain on the right L4, S1, and S2 roots. *Id.*  PA Thompson determined that Plaintiff's limitations as noted on March 24, 2008,

---

[10] Oxaprozin is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs).  Oxaprozin works by reducing hormones that cause inflammation and pain in the body.  Oxaprozin is used to treat pain or inflammation caused by arthritis. EVERYDAYHEALTH.

continued.  R. 238.  Dr. Valentine's name is printed on the form, but the form is signed only by PA Thompson.  *Id.*

On June 4, 2008, Plaintiff returned to Dr. Valentine.  R. 237.  She complained of pain at level 10 in her lower right back and down her leg.  *Id.*  Range of motion of her right shoulder was limited in all directions due to pain, and the top of her right shoulder was swollen and tender to touch.  *Id.*  She also had reduced sensation in the third digit of her right hand.  *Id.*  Dr. Valentine's impression was lower back pain in the lumbar and thoracic regions, but with no evidence of cervical herniated nucleus pulposus.  R. 236. On examination he found that her right shoulder was swollen and very tender to palpation.  *Id.*  Her grip strength on the right was "much reduced compared to her left hand."  *Id.*  Dr. Valentine said that the "mechanism of injury suggests she may have suffered some injury to her Right brachial plexus," and he thought she needed to be referred to a neurologist.  *Id.*  Plaintiff was very frustrated with the refusal of the workers' compensation carrier to authorize physical therapy, which had improved the pain in her shoulder.  *Id.*  Physical therapy with R. Johansen was no longer authorized.  *Id.*  Dr. Valentine doubted that workers' compensation would approve a neurology consult either.  *Id.*  PA Thompson said that Plaintiff's functional limitations were the same as on March 24, 2008.  R. 238.

On July 2, 2008, Plaintiff continued to complain to Dr. Valentine about right upper extremity pain and lateral hip pain.  R. 229.  She said the pain level was 8, but pain behaviors were not exhibited.  R. 230.  While she had full range of motion in her cervical spine and there was no evidence of cervical herniated nucleus pulposus, Dr. Valentine

found cervical pain trigger points and "upper trap TrP," and the range of motion of her shoulder was limited.  *Id*.  She had been denied referral to an orthopedist.  R. 229.  Her right shoulder continued to be swollen and very tender to palpation, and her grip strength on the right was much reduced when compared with the left.  *Id*.  She asked for and received a trigger point injection for her right shoulder pain.  *Id*.  Dr. Valentine and PA Thompson found that Plaintiff could not lift or push with her right arm, could sit only occasionally, could stand only occasionally for 30 minutes at a time, and could work only 4 hours per day with frequent changes of position.  R. 233.

On August 1, 2008, Dr. Valentine determined that Plaintiff had cervical pain trigger points, with cervical spasm and tenderness.  R. 228.  Plaintiff's gait was abnormal due to knee pain.  *Id*.  Plaintiff reported worsening low back pain with radiation into her right upper buttocks and right lateral hip and thigh.  *Id*. and R. 227.  Her right shoulder pain was "much improved following trigger point injections at last office visit," but on examination, was still "quite tender" in that shoulder, and had a "palpable mass" in that area.  R. 227.  Dr. Valentine's diagnostic impression was that Plaintiff had lumbar and thoracic pain, no evidence of cervical herniated nucleus pulposus, and possible shoulder joint pathology.  *Id*.  He reviewed studies discussed above which suggested a radicular component to her pain at the L4, S1, and S2 roots, and he said that the mechanism of her injury suggests that she may have suffered some injury to her right shoulder.  *Id*.  PA Thompson filled out additional functional limitations evaluations.  R. 225.  He said that Plaintiff's limitations were the same as found by the July 2, 2008, evaluation.  *Id*.

On August 12, 2008, Plaintiff had a lumbar epidural injection for her pain.  R. 223.

On August 27, 2008, Dr. Valentine found that Plaintiff had limited lumbar range of motion and flexion, her sacroiliac joint was tender to palpation on the right, and weight bearing on her right leg was very painful in her right hip and S1 spinal area.  R. 220. Several tests for pain in the S1 region were positive for pain.  *Id.*  Plaintiff's gait was abnormal due to pain in her right hip and S1 region.  R. 219.  However, Plaintiff reported that her lumbar back and right lower extremity radicular pain had resolved following the epidural on August 12, 2008.  *Id.*  Plaintiff continued to report pain in her right upper buttock and hip, worse with standing or walking.  *Id.*  Dr. Valentine found that Plaintiff could not put her full weight on her right leg, and he found that she could not fully sit because she had to lift her right buttock slightly to take pressure off that area.  *Id.*  Dr. Valentine noted:

> She says this Right hip/buttocks pain began with the work injury in 2006
> with the forklift hitting her in the Right hip/buttocks, and she has continued
> since then.  This mechanism of injury would likely put abnormal stress on
> the Right S1 joint and is likely to cause this pain.

*Id.*

On September 16, 2008, Plaintiff had another injection, this time for her sacroiliac joint.  R. 216.

On September 24, 2008, Plaintiff reported to Dr. Valentine that her pain was only 5 on the scale of 10, and was in her lower right back and down her right leg.  R. 213. She ambulated with use of a cane.  *Id.*  PA Thompson said that Plaintiff had no limitations for sitting, could stand 1 hour at a time, but could still only work 4 hours per

day with frequent changes of position.  R. 215.  On the same date, Plaintiff told Dr.

Valentine that the injection had much improved her low back and right lower extremity

radicular pain where, said Plaintiff, she experienced most of her pain.  R. 212.

On October 22, 2008, Plaintiff again saw Dr. Valentine.  R. 207-208.  She

continued to walk with a cane.  R. 208.  She continued to report much improvement of

her low back and right lower extremity radicular pain after the injection.  R. 207.  She

said she had increased pain if she sat for more than 1 or 2 hours.  *Id.*  She had stopped

all of her pain medications for a "court appearance," and was in "much pain" that day.

*Id.*  Dr. Valentine said that Plaintiff would continue to need oral pain medications, and

possible further injections, "for an [undetermined] length of time."  *Id.*  Maximum medical

improvement was not as certain, said Dr. Valentine, since her right S1 pain had

increased since the last visit.  *Id.*  Plaintiff was then taking Gabapentin[11] for neuropathic

pain, tramadol for pain, Oxaprozin for inflammation and pain, Carisoprodol[12] for muscle

spasms, Lidoderm patches[13] for right S1 pain, and used a "combo" electrical stimulator.

*Id.*  PA Thompson completed a functional capacity report that date and again said that

Plaintiff is limited to a 4 hour workday with frequent position changes.  R. 209.  He said

she could sit for only 2 hours at a time and stand for only 1 hour.  *Id.*  As with the last

---

[11] Gabapentin is an anti-epileptic medication, also called an anticonvulsant.  It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain.  Gabapentin is also used to treat nerve pain caused by herpes virus or shingles (herpes zoster).  EVERYDAYHEALTH.

[12] Carisoprodol is a muscle relaxer that works by blocking pain sensations between the nerves and the brain.  EVERYDAYHEALTH.

[13] A lidoderm patch is an adhesive material comprised of 5% lidocaine per gram of adhesive.  PUBMED HEALTH.

few workers' compensation evaluations, Dr. Valentine's name is printed on the form but he did not sign it. *Id.*

On November 19, 2008, Plaintiff reported to Dr. Valentine that her pain had improved since the injection on September 16, 2008.  R. 203.  Her gait was normal that day, and pain behavior was not exhibited.  R. 204.  She also said that the "combo" stimulator had helped a lot with her pain.  R. 203.  Her pain medications had relieved some of her pain without adverse side effects.  *Id.*  Her workers' compensation case had been settled, and it was uncertain whether she could continue treatment with Dr. Valentine.  *Id.*  Her medications were continued.  *Id.*  PA Thompson said that Plaintiff's functional limitations remained the same as he stated on October 22, 2008.  R. 205.

There do not seem to be any medical records from October, 2008, to October, 2009.  On October 15, 2009, Plaintiff reported to Dr. Jaffe that she was having increased pain, and he noted that she had not seen him for her right knee pain since October 30, 2008.  R. 202.  An effort was underway to help her with future medical expenses through the WeCare program.  *Id.*

Finally, Plaintiff's blood pressure has fluctuated over the period covered by the medical records.  Plaintiff's blood pressure was 150/72 on 182/102 on December 14, 2006.  R. 127.  It was 194/106 and noted to be hypertensive, stage II, on September 21, 2007.  R. 296.  It was 185/96 on December 10, 2007.  R. 272.  It was 193/115 on January 7, 2008.  R. 265.  It was 165/95 on February 25, 2008.  R. 253.  She was noted to have "prehypertension" on April 1, 2008, with blood pressure of 117/81.  R. 228.  On May 4, 2008, it was 136/82 (prehypertension).  R. 237.  On May 6, 2008, her blood

pressure was 124/80 (prehypertension).  R. 242.  On June 4, 2008, her reading was

136/82 (prehypertension).  R. 237.  On August 1, 2008, it was 117/81 (prehypertension).

R. 228.  On August 27, 2008, it was 136/85 (prehypertension).  R. 220.

**Legal analysis**

> **Whether the ALJ erred in failing to find at step 2 that Plaintiff had a
> "severe" impairment of hypertension**

Hypertension was not among the "severe" impairments noted by the ALJ when

she did her step 2 analysis.  R. 15.  At step 2, the issue is whether Plaintiff has shown

that she has a condition which has more than "a minimal effect on her ability to:  walk,

stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273,

1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).   "In other words, the 'severity'

of a medically ascertained disability must be measured in terms of its effect upon ability

to work, and not simply in terms of deviation from purely medical standards of bodily

perfection or normality."  McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which

has such a minimal effect on the individual that it would not be expected to interfere with

the individual's ability to work, irrespective of age, education, or work experience.' "

Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), citing Brady v. Heckler, 724

F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984),

and Flynn, 768 F.2d at 1274.

As noted above, Plaintiff's blood pressure has been in the hypertensive, stage II

range, but recently, has been lower, in the prehypertensive range.  But even if Plaintiff's

blood pressure had been consistently in the hypertensive range, that, by itself, is merely

a "deviation from purely medical standards of bodily perfection or normality."  McCruter

v. Bowen, 791 F.2d at 1547.  However, high blood pressure, coupled with side effects

from blood pressure medication, may cause weakness, drowsiness, visual problems,

and difficulty standing.  Parker v. Bowen, 793 F.2d 1177, 1179 (11th Cir. 1986).  Thus,

"hypertension without significant end organ damage may be a severe impairment" at

step 2.  Id., at 1180.

In Flynn, the claimant had contended that she had "uncontrollable, severe

hypertension."  768 F.2d at 1274.  Her treating physicians had found that she could not

return to her former employment due to this condition.  Id. at 1275.  One physician had

warned that should she return to her former work, she had "good reason to be fearful

that her work will cause her blood pressure to elevate again and may possibly cause

stroke or heart attacks."  Id.  The court reasoned that on this record, the decision that

the claimant had not shown a "severe impairment" was not supported by substantial

evidence in the record.  Id.  The court expressed concern that by making a finding of no

severe impairment at step 2 of the analysis, the Commissioner had foreclosed the

claimant's "ability to demonstrate the merits of her claim for disability with respect to her

former work activities."  Id.

Flynn is distinguishable from the case at bar.  Plaintiff here has not pointed to

any evidence in the record that her blood pressure, or any medication she might take for

her blood pressure, has had any effect upon her ability to work.  There is no evidence

that her hypertension or blood pressure medications have caused weakness,

drowsiness, visual problems, or difficulty standing.  This first contention, therefore, is not

persuasive.  *See* Martin v. Astrue, 2010 WL 1286520, *11-13 (S.D. Fla. Feb 24, 2010)

(No. 09-81136-CIV) (not error to not find claimant's obesity was a "severe" impairment

at step 2 because there was no showing that the claimant's obesity limited her ability to

work in any way), *report and recommendation adopted by* 2010 WL 1257902 (S.D. Fla.

Mar 30, 2010).

### Whether the ALJ erred in failing to give substantial weight to the opinions of treating physicians

Plaintiff contends that the ALJ failed to give substantial weight to the opinions of

Drs. Jaffe, Berk, and Valentine, Plaintiff's treating physicians.  The opinion of a

claimant's treating physician must be accorded considerable weight by the

Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125

F.3d 1436, 1440 (11th Cir. 1997); Winschel v. Commissioner of Social Sec., 631 F.3d

1176, 1179 (11th Cir. 2011).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of individual examinations,
> such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a

"detailed, longitudinal picture" of impairments is the length of the treatment relationship,

the frequency of examination, the extent of the knowledge of the treating source as

shown by the extent of examinations and testing, the evidence and explanation

presented by the treating source to support his or her opinion, the consistency of the

opinion with the record as a whole, and whether the treating source is a specialist with

respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Winschel, 631 F.3d at 1179; Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The Administrative Law Judge noted the findings of Drs. Kouri and Berk shortly after Plaintiff's work accident, that imaging studies of Plaintiff's spine, revealed no disc protrusions or herniations, and nerve conduction studies were generally normal.  R. 18, 17.[14]  It was also noted that on February 13, 2007, Plaintiff had normal strength and sensation in her lower extremities, except for the right S1 dermatome, and by March 13,

---

[14] As a housekeeping matter, pages 5 and 6 of the ALJ's opinion are reversed in the record.  Page 5 is R. 18, and page 6 is R. 17.

2007, ambulated with a non-antalgic gait and had negative straight leg raising bilaterally.  R. 17.  The ALJ then said: "While Dr. Robert Valentine's treatment references sporadic tenderness and decreased range of motion of the claimant's lumbar spine, these are not consistent with the radiological evidence."  *Id.*  The ALJ reasoned that that while Dr. Jaffe treated Plaintiff's knee injury, "his opinion that the claimant is unable to carry weight is outside the realm of his treatment of the claimant."  R. 19.  She also reasoned that "Dr. Jaffe's other opinion that the claimant can perform only 'limited' standing or walking is too vague to provide insight into the claimant's functional abilities."  *Id.*  The ALJ determined that Dr. Jaffe's "other opinions" were not well supported by "medically acceptable clinical signs or laboratory findings and rely too heavily on the claimant's subjective complaints."  *Id.*  Finally, the ALJ noted that Dr. Jaffe said that Plaintiff was unable to perform even sedentary work from April 19, 2007, to September 27, 2007, and then rejected this as "post-surgical opinions that did not last twelve months."  *Id.*

Likewise, the ALJ determined that Dr. Valentine's opinion was not supported by medically accepted clinical signs or laboratory findings or his own treatment records.  R. 19.  She noted that Dr. Valentine's treatment notes for February 25, 2008, and March 24, 2008, did not contain any clinical signs of back pain, yet Dr. Valentine determined that Plaintiff had "severe functional limitations on these dates."  *Id.*  She noted that Dr. Valentine found that Plaintiff had full range of motion of her cervical spine on July 2, 2008, but had "trigger points."  *Id.*  The ALJ said that Dr. Valentine "relied too heavily on the claimant's subjective complaints."  *Id.*

The ALJ concluded, therefore, that the opinions of Drs. Jaffe and Valentine were "excessive."  R. 19.  She rejected any opinion by PA Thompson because he was "not an acceptable medical source and the record contains no evidence that he examined the claimant."  *Id.*

This reasoning is based in part upon substantial evidence in the record.  In early 2007, shortly after the accident, an x-ray revealed no evidence of spinal fracture, an MRI of Plaintiff's spine was normal, and nerve conduction studies were normal.  R. 128, 125, 199.  Dr. Berk thought that Plaintiff's only work limitations were in the amount of weight she might be able to lift.  R. 179.  Further, on March 13, 2007, before the knee surgery, Plaintiff was observed to walk into Dr. Berk's office in high heels without any antalgic gait.  R. 200.  Dr. Berk found that Plaintiff had fairly full lumbar range of motion without tenderness or muscle spasm, and the straight leg raising test was negative for pain.  *Id.*

An MRI of Plaintiff's knee in April, 2007, however, revealed a complex degenerative tear.  R. 196.  Still, she walked with a non-antalgic gait and had full range of motion in both knees, though with tenderness of the right knee.  *Id.*  On April 11, 2007, Dr. Jaffe observed that she walked with a mild limp, and Dr. Jaffe agreed that knee surgery was indicated.  R. 194-195.  The knee surgery occurred on April 20, 2007.  R. 189.  After knee surgery, Plaintiff was observed to walk with a limp on several occasions, and four months of physical therapy after the surgery did not improve her knee impairment.  R. 186, 184, 183, 180.  On October 8, 2007, Dr. Jaffe said that Plaintiff could return to work, but could not bend, carry, climb, kneel, or lift, and was

limited in her ability to stand or walk. R. 166. Thus, there was objective medical evidence of injury to Plaintiff's knee and there was objective evidence that surgery did not completely resolve the problem of knee pain.

The ALJ's specific finding that Dr. Jaffe's opinion was unable to carry weight was beyond "the realm of his treatment" of Plaintiff is not supported by substantial evidence in the record. An ability to lift and carry requires an unimpaired ability to stand or walk. Dr. Jaffe's opinion that Plaintiff was unable to carry weight was not beyond his expertise.

While Dr. Jaffe's conclusion that Plaintiff was "limited" in her ability to stand or walk did not specifically define those limits, this opinion was not too vague "to provide insight into the claimant's functional abilities" and is not a sufficient reason to completely discount Dr. Jaffe's opinion. Dr. Jaffe had treated Plaintiff's knee injury for months, and his opinion that Plaintiff had some limitations for standing and walking should have been given substantial weight.

Alleged lack of clinical signs, reliance upon Plaintiff's subjective reports, and the finding that the injury did not last more than 12 months, are insufficient reasons to reject Dr. Jaffe's opinion. The objective medical evidence of a serious knee injury, an MRI in April, 2007, is well-documented in this record, and is substantial evidence to corroborate the degree of pain subjectively reported by Plaintiff.[15] Moreover, physicians routinely

---

[15] Pain and other symptoms reasonably attributed to a medically determinable impairment *are relevant evidence* for determining residual functional capacity. Social Security Ruling 96-8p, p. 4.

In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test

rely upon subjective reports from patients, and treating physicians are in the best position to judge patient credibility.  *See* Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003), *quoting* Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997) ("The fact that Dr. Helfand also relied on [plaintiff's] subjective complaints hardly undermines his opinion as to her functional limitations, as '[a] patient's report of complaints, or history, is an essential diagnostic tool.' ").  That is why the opinion of a treating physician must be given substantial weight absent significant evidence to the contrary.  Further, the substantial evidence shows that Plaintiff's knee injury persisted for more than 12 months.  Dr. Jaffe said that Plaintiff's knee condition had not improved after four months of physical therapy following surgery.  Plaintiff continued to limp more than 12 months after the surgery, and walked with a cane in October, 2008.[16]  R. 208.  It was error to discount Dr. Jaffe's opinion for these reasons.

The ALJ did not discount Dr. Jaffe's opinion because she determined that Plaintiff's permanent whole body impairment from her knee injury was only 8%, as suggested now by the Commissioner in his memorandum.[17]  Doc. 14, p. 17.  But if she

---

showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).

[16] Dr. Valentine reported that her gait was normal on November 19, 2008, (R. 203), but more consistently found that Plaintiff's gait was antalgic (R. 295, 272, 265, 228, 220, 213, 208).

[17] On administrative review of an action of an agency of the Executive Branch, this court may not "substitute counsel's *post hoc* rationale for the reasoning supplied by the"

had, the reasoning would not be supported by substantial evidence in the record.  Dr.

Jaffe specifically said that his 8% permanent impairment rating was based only upon

Plaintiff's knee injury "without any rating assigned by me in regard to her back."  R. 180.

Dr. Jaffe was well-aware of Plaintiff's back pain and the treatment provided by Dr.

Valentine.  *Id.*

    In summary, Dr. Jaffe's opinion should have been given substantial weight and it

was error not to do so.

    As discussed immediately above, the radiological evidence from early 2007 did

not show any significant cause for spinal or shoulder pain.  Further, an MRI of Plaintiff's

cervical spine on January 11, 2008, revealed a slight disc bulge at C4-C5, but without

other abnormalities, and Dr. Valentine said that there was no evidence of cervical

nucleus pulposus.  R. 263-262, 253.  To this extent, the ALJ's determination that Dr.

Valentine's findings of pain and decreased range of motion were "not consistent with"

the radiological evidence is supported by substantial evidence in the record.

    The determination, however, disregards other objective clinical signs and test

results that fully support Dr. Valentine's opinion.  "Unless the Secretary has analyzed all

---

agency itself.  N.L.R.B. v. Kentucky River Community Care, Inc., 532 U.S. 706, 715 n.1,
121 S.Ct. 1861, 1868 n.1, 149 L.Ed.2d 939 (2001), *quoting*, N.L.R.B. v. Yeshiva Univ.,
444 U.S. 672, 685, n. 22, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (citing Securities and
Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91
L.Ed. 1995 (1947)); Real v. Simon, 514 F.2d 738, 739 (5th Cir. 1975) (denying
rehearing of Real v. Simon, 510 F.2d 557 (5th Cir. 1975)); Golembiewski v. Barnhart,
322 F.3d 912, 916 (7th Cir. 2003); Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir.
2001); Owens v. Heckler, 748 F.2d 1511, 1516 (11th Cir. 1984) ("We decline, however,
to affirm simply because some rationale might have supported the ALJ's conclusion.
Such an approach would not advance the ends of reasoned decision making.") (citing
Chenery); McDaniel v. Bowen, 800 F.2d 1026, 1032 (11th Cir. 1986).

evidence and has sufficiently explained the weight he has given to obviously probative

exhibits, to say that his decision is supported by substantial evidence approaches an

abdication of the court's 'duty to scrutinize the record as a whole to determine whether

the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th

Cir. 1981) (citations omitted).

　　　　Dr. Valentine conducted another battery of nerve conduction tests in September,

2007, and found significant neurological impairments at S1, S2, L1, L3, L5, and C6.  R.

290, 288.  Further, on examination of Plaintiff on September 21, 2007, Dr. Valentine

noted several objective clinical signs confirming her report of disabling pain, that she

had thoracic and lumbar tenderness, muscle spasm, reduced range of motion of her

lumbar spine, and positive findings for pain with supine straight leg raising and axial

loading.  R. 294-295.  On October 5, 2007, Dr. Valentine found that Plaintiff's lumbar

spine range of motion was limited and she had paraspinous tenderness and muscle

spasm.  R. 284.  On January 7, 2008, Dr. Valentine found that Plaintiff's grip strength

was decreased on the right.  R. 265.  On January 28, 2008, Dr. Valentine found that

Plaintiff's right shoulder had limited range of motion and tenderness in her right biceps.

R. 259.  On June 4, 2008, Plaintiff's range of motion of her right shoulder was limited in

all directions due to pain, and the top of her shoulder was swollen and tender to touch.

R. 237.  She also had reduced sensation in the third digit of her right hand, and her grip

strength on the right was "much reduced."  R. 236.  On July 2, 2008, although Plaintiff

had full range of motion of her cervical spine, there were cervical pain trigger points, her

right shoulder continued to be swollen, very tender to palpation, her range of motion

was limited, and her grip strength was still "much reduced" on the right.  R. 230.  On

August 1, 2008, Dr. Valentine found that Plaintiff continued to have cervical pain trigger

points, with spasm and was "quite tender," and she had a palpable mass in her shoulder

area.  R. 227-228.  On August 27, 2008, Dr. Valentine found that Plaintiff continued to

report pain in her right upper buttock and hip.  R. 219.  He observed that she could not

put her full weight on her right leg due to pain in her right hip and S1 region, and he

observed that she had to lift her right buttock slightly to take pressure off that area.  *Id.*

On examination of Plaintiff, Dr. Valentine found that she had limited lumbar range of

motion and flexion, her sacroiliac joints was tender to palpation.  R. 220.  Dr. Valentine

conducted several tests with positive results for pain.  *Id.*  All of these are objective

laboratory findings and objective clinical signs supportive of Dr. Valentine's opinion.  For

these reasons, it was error for the ALJ to conclude that Dr. Valentine's opinion was not

supported by medically accepted clinical signs or laboratory findings.

Considering all of the evidence in the record, therefore, the ALJ's decision to

reject the opinions of Drs. Jaffe and Valentine is not supported by substantial evidence

in the record.  It was error not to give those opinions substantial weight.

It has long been the apparent rule in this circuit that:  "Where the Secretary has

ignored *or failed properly to refute* a treating physician's testimony, we hold as a matter

of law that he has accepted it as true."  MacGregor, 786 F.2d at 1053 (emphasis

added); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991);

Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD);

Cole v. Barnhart, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding that the opinions of the

treating physician must be accepted as true where the ALJ "did not properly refute them" but did not ignore them).  For many years I have recommended that the opinion of a treating physician be accepted as true where not properly "refuted" by the ALJ, and have recommended in such cases that benefits be awarded.  *E.g.*, Edelen v. Astrue, 711 F.Supp.2d 1330, 1347 (N.D. Fla. May 6, 2010) (No. 4:09CV229-RH/WCS).  I am no longer confident that this is what the Eleventh Circuit would have this court do.

In Winschel, the court said:

> The ALJ did not mention the treating physician's medical opinion, let alone give it "considerable weight."  Likewise, the ALJ did not discuss pertinent elements of the examining physician's medical opinion, and the ALJ's conclusions suggest that those elements were not considered.  It is possible that the ALJ considered and rejected these two medical opinions, but without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence.

631 F.3d at 1179.  The court remanded to correct this error.  *Id.*

Winschel, MacGregor, and Elam are cases where the ALJ completely failed to discuss the opinion of the treating physician, that is, he ignored the opinion of the treating physician.  Of course ignoring an opinion results in failure to properly refute it.  Elam and MacGregor direct that the court and the Commissioner must accept the medical opinions as true when this occurs.  Winschel directs instead that the court remand for further consideration without such direction.  The cases, therefore, are in conflict as to what a district court should do under these circumstances.

A recent unpublished decision of the Eleventh Circuit explains why the procedure in Winschel should be followed.  In Lawton v. Commissioner of Social Sec., 2011 WL 2471475, *4 (11th Cir.  Jun 22, 2011) (not selected for publication in the Federal

Reporter, No. 10-15816), the ALJ failed to explain the weight he afforded to the opinions of treating physicians.  The court acknowledged MacGregor, but held that it was bound by earlier Eleventh Circuit decisions, notably Owens v. Heckler, 748 F.2d 1511, 1516 (11th Cir.1984) and Wiggins v. Schweiker, 679 F.2d 1387, 1390 (11th Cir.1982), which had remanded without finding that the opinion of the treating physician must be accepted as true.

In the case at bar, the ALJ properly sought to discuss the weight to be given the opinions of these treating physicians, and did not ignore them.  The case at bar is not like Winschel, MacGregor, Elam, or Lawton in this respect.  The case at bar is like Harris v. Astrue, 546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT).  In that case, the court remanded, not because the ALJ had failed to mention or discuss the treating physician's opinion, but because the ALJ gave improper reasons to discount the opinion of a treating physician.

I believe that the proper procedure after Winschel is to remand, whether the ALJ has "ignored" the opinion of a treating physician, or has mentioned it, but did not properly refute it with reasons supported by substantial evidence.  However, there is a difference between this court finding error in failing to give substantial weight to the opinion of a treating physician, and in this court finding such an opinion to be true and directing that benefits be awarded.  Error, when it is determined, must not persist on remand.  It was error for the ALJ not to give substantial weight to the opinions of the treating physicians, Drs. Jaffe and Valentine. On remand, the ALJ must do so as he or she reconsiders Plaintiff's applications for benefits.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were not based upon substantial evidence in the record and did not correctly follow the law.  The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and remanded.  The ALJ must give substantial weight to the opinions of treating physicians Drs. Jaffe and Valentine.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the case be **REMANDED** for reconsideration in light of this report and recommendation, to give substantial weight to the opinions of treating physicians Drs. Jaffe and Valentine.

**IN CHAMBERS** at Tallahassee, Florida, on August 31, 2011.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.